CHRISTOPHER R. ORAM, ESQ
Nevada Bar No. 004349
520 South Fourth Street, Second Floor
Las Vegas, Nevada 89101
(702) 384-5563

Attorney for Defendant
DEAN COLEMAN

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

* * * * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DEAN COLEMAN,<br><br>Defendant. | CASE NO. 2:18-cr-00219-RFB-VCF<br><br>**MOTION TO SUPPRESS**<br><br>**(Evidentiary Hearing Requested)** |

**CERTIFICATION:**  This Motion is timely filed.

COMES NOW, Defendant, DEAN COLEMAN, by and through his attorney, CHRISTOPHER R. ORAM, ESQ., and hereby files this Motion to Suppress (Evidentiary Hearing Requested), based upon violations of Mr. Coleman's constitutional rights, and respectfully moves this Court for an Order suppressing all evidence obtained as a result of the constitutional violations.

This Motion is supported by the following Points and Authorities

DATED this 11th day of October, 2019.

                         Respectfully submitted:

                         /s/ Christopher R. Oram, Esq.
                         CHRISTOPHER R. ORAM, ESQ.
                         Nevada Bar #004349
                         520 S. Fourth Street, 2nd Floor
                         Las Vegas, Nevada 89101
                         (702) 384-5563

                         Attorney for Defendant
                         DEAN COLEMAN

CHRISTOPHER R. ORAM, LTD.
520 SOUTH 4TH STREET | SECOND FLOOR
LAS VEGAS, NEVADA 89101
TEL. 702.384.5563 | FAX. 702.974.0623

# STATEMENT OF FACTS

The government alleges that on January 18, 2018, Mr. Coleman, having been previously convicted of a felony, was found to be unlawfully in possession of a firearm (ECF No. 1, p. 1-2).

### A.   FACTS ADDUCED FROM DISCOVERY

Officers from the Las Vegas Metropolitan Police Department allege that they were operating a marked patrol unit near J Street and Lake Mead when a vehicle drove westbound on Lake Mead passing them with high beam headlights on (Discovery, p. 6).[1] Officers then turned around, got behind the vehicle, and conducted a vehicle stop (Discovery, p. 6). Once the officers approached the vehicle, Officer Ostroga asked the driver for his license to which he responded he did not have a license, but did have an identification card (Discovery, p. 6). At that point, the driver handed the officer his identification card indicating he was using his high beams because one of his headlights was out (Discovery, p. 6). The driver of the vehicle was identified as Dean Coleman (Discovery, p. 6). The officers then conducted a records check on Mr. Coleman and learned he had previously been convicted of a felony in 2012 (Discovery, p. 6).

Officer Ostorga then requested Mr. Coleman step out of the vehicle (Discovery, p. 6). Officers noted Mr. Coleman was cooperative throughout the duration of their encounter (Discovery, p. 6). Officers then ask Mr. Coleman for consent to search the car, to which Mr. Coleman agrees (Discovery p. 6). A search of the car revealed a handgun behind the paneling of the driver side center console (Discovery, p. 6-7). Once the handgun was located, Officers froze the vehicle pending a search warrant and placed Mr. Coleman in handcuffs (Discovery p. 7).

---

[1] Mr. Coleman has requested and a subpoena has been issued for the body camera footage pertaining to this portion of the stop. The body camera footage in the possession of counsel does not begin until the police vehicle is already behind Mr. Coleman.

After placing Mr. Coleman in handcuffs, the Officer indicated he viewed a "W" tattoo on Mr. Coleman's hands (Discovery, p. 7). The officer claimed he was aware the tattoo was gang related and began questioning Mr. Coleman about where he was from (Discovery p. 7). Officers alleged Mr. Coleman responded he was a member of the Piru Bloods gang (Discovery, p. 7).

Once the search warrant was granted, Officers recovered a .45 caliber handgun and two magazines (Discovery, p. 7).

### B.   FACTS ADDUCED FROM THE BODY CAMERA FOOTAGE[2]

Suspiciously absent from the Officers reports are the full context of the stop. Moreover, several facts as enunciated by the officers in the report are completely belied by the body camera footage.

A review of the body camera footage depicts that immediately after being pulled over, the officer indicated he pulled over Mr. Coleman for using high beam headlights. The officer asked Mr. Coleman if he was the registered owner of the vehicle, to which he responded he was not and that the vehicle belonged to his girlfriend. The officer then asks Mr. Coleman for his drivers license, to which Mr. Coleman indicated he did not have one. Mr. Coleman then provides the officer with an identification card.

The officer then asks Mr. Coleman whether he has ever been in trouble with the law. Mr. Coleman told the officer he went to prison for robbery when he was a juvenile (1m:20s). While holding Mr. Coleman's identification, the officer then begins to question Mr. Coleman about gang affiliations (1m:45s). The officer continued questioning Mr. Coleman about who he "rolls with". Mr. Coleman responded that he was in a gang when he lived in California, but that was when he

---

[2] The body camera footage referenced in this Motion is entitled "467-file_4" in discovery and is 39 minutes in length. The citations provided are from the time elapsed in the footage.

3

was a juvenile. Mr. Coleman again stated he was not a member of any gang since residing in Nevada (2m:05s). The officer then indicated to Mr. Coleman he would call a California gang unit to obtain information on him. The officer continued to question Mr. Coleman as to what gang he belonged to. Mr. Coleman indicated he was a member of the Bloods in California (2m:15s). The officer told Mr. Coleman that he would keep asking him questions until he tells him everything (2m:19s). Mr. Coleman indicated he was a member of the Piru Bloods in California (2m:30s).

At that point, the officer then proceeds back to his vehicle with the identification card (2m:35s). A records check revealed that Mr. Coleman did not have a current drivers license and that he did not have any active warrants. The officer learned Mr. Coleman was on federal probation (3m:45s-4m:40s).

The officer requested Mr. Coleman step out of the vehicle (5m:50s). Mr. Coleman was told to place his hands on the front of the police car. When the officer asked Mr. Coleman if he was on probation, he indicated he was on federal probation (5m:05s). Once Mr. Coleman was outside of the vehicle, the officer conducted a cursory search of both the front and backseat of the vehicle with his flashlight (5m:40s). The officer did not locate anything suspicious. Mr. Coleman was asked whether there was anything they should know about in the car, to which Mr. Coleman indicated there was not (5m:50s).

After the officer twice asked Mr. Coleman for permission to search the car, Mr. Coleman gave his consent. Before officers searched the car, Mr. Coleman told officers he was aware he was driving without a license and asked whether instead of taking the car if he could have the owner of the car come get it or he could pay for a tow to take the car home (7m:00s).

///

///

4

///

# ARGUMENT

**I. MR. COLEMAN IS ENTITLED TO SUPPRESSION BECAUSE THE EXTENDED DURATION OF THE STOP WAS UNREASONABLE GIVEN THE CIRCUMSTANCES AND THUS UNCONSTITUTIONAL IN VIOLATION OF THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

In this case, the investigative methods employed failed to be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. The extended amount of time the officer took to ask Mr. Coleman unrelated questions made the detention unreasonable and in violation of the Fourth Amendment to the United States constitution. Given the illegal and unreasonable detention, the consent to search obtained was not valid. As is demonstrated below, Mr. Coleman is entitled to suppression.

The Fourth Amendment of the United States Constitution as incorporated to the States through the Fourteenth Amendment, express the long-standing and well recognized foundation of American criminal procedure that:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by Oath or Affirmation, particularly describing the place or places to be searched, and the person or persons, and thing or things to be seized. Nev. Const. Art. 1 Sec. 18; U.S. Const. Amend. IV.

All individuals have a Constitutionally protected right to privacy guaranteed to by the Fourth Amendment of the United States Constitution. The "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" is considered a fundamental right. *See Silverman v. United States*, 365 U.S. 505, 511, 81 S. Ct. 679, 682, 5 L. Ed.2d 734 (1961)

Under the Fourth Amendment, warrantless searches, with a few specifically

established exceptions are per se unreasonable *Schneckloth v. Bustamonte*, 412 U.S. 218, 218, 86 L. Ed. 2d 854, 93 S. Ct. 2041 (1971); *Katz v. United States*, 389 U.S. 347, 357, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1972).

The burden of proof for a motion to suppress based on the fourth amendment is on the proponent of the motion. *Rakas v. Illinois*, 439 U.S. 128, 130, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978). "The controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence". *United States v. Matlock*, 415 U.S. 164, 177, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974).

### A. THE OFFICER'S DETENTION AND QUESTIONING OF MR. COLEMAN WAS UNREASONABLE RESULTING IN AN UNCONSTITUTIONAL EXTENDED STOP.

In this case, Mr. Coleman, a young African American male, was stopped while driving at night by police for allegedly having his high beam headlights on. When the police requested a driver's license from Mr. Coleman he truthfully indicated he did not have one and provided the officer with an identification card (Discovery, p. 6). As can be seen on the body camera footage, the recounting of the traffic stop by officers is completely false. The officers claim that after they located the firearm and placed Mr. Coleman in handcuffs, they noticed a gang related tattoo and began to question Mr. Coleman about gang affiliation (Discovery, p. 7).

Fortunately for Mr. Coleman, the body camera footage reveals what actually occurred in this case. Immediately after stopping Mr. Coleman, before the officer even ran a check on the vehicle or the identification card, the officer began badgering Mr. Coleman about whether or not he had a criminal record and what gang he belonged too (Body Camera Footage, 1m:20s). The questioning about gang affiliation continued and culminated with the officer telling Mr. Coleman that he would continue to ask him what gang he belonged to until he answered

(2m:19s). It is not until after the officer concludes his questioning of Mr. Coleman about gangs and criminal history that he proceeds to his vehicle to perform a computer check on the documents Mr. Coleman provided (2m:35s).

It is important to note that a check of the vehicle Mr. Coleman was driving did not reveal the vehicle was stolen and Mr. Coleman did not have any active warrants. Additionally, the police did not describe any bizarre behavior on behalf of Mr. Coleman and Mr. Coleman was cooperative with officers during the entire encounter (Discovery, p. 6). Despite all of this, the police then ordered Mr. Coleman out of the vehicle, Mr. Coleman's body was searched as well as a cursory search of the car were performed, and Mr. Coleman was ordered to place his hands on the hood of the police car (5m:50s). It was not until this point, that police requested consent to search the vehicle.

Police are permitted to request a drivers' license and registration during a valid traffic offense stop. *United States v. Sharpe*, 470 U.S. 675, 105 S. Ct. 1568 (1985). The mission of a traffic stop includes determining whether to issue a traffic ticket and checking the driver's license, determining whether there are any outstanding warrants against the driver, inspecting the vehicle's registration and proof of insurance. A stop that is unreasonably prolonged beyond the time needed to perform these tasks ordinarily violates the Constitution. *United States v. Gorman*, 859 F.3d 706 (9th Cir. 2017), *order corrected* 870 F.3d 963 (9th Cir. 2017).

"[A]n officer's inquiries into mattes unrelated to the justification for the traffic stop do not convert the encounter into something other than a lawful seizure, so long as the inquiries do not measurably extend the stop's duration." *Arizona v. Johnson*, 555 U.S. 323, 333, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009).

In *Sharpe,* the United States Supreme Court held that a stop under *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968) required the police to

7

diligently pursue a means of investigation that would quickly confirm or dispel their suspicion. An investigative stop that was neither consensual nor the result of probable cause must fulfill two requirements: 1) the stop must be "justified at its inception," and 2) the resulting detention must be "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Shareef*, 100 F.3d 1471, 1500–01 (10th Cir. 1996) (quoting, *Terry*, 392 U.S. at 20). In the absence of probable cause or a warrant, the officer must have "an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring" in order to justify detaining an individual for a period of time longer than that necessary to conduct the investigation and issue a citation. *See McRae*, 81 F.3d at 1534.

In analyzing whether a detention exceeds the justification for the stop, the crucial question is whether the detention is unnecessarily prolonged. *See Rodriguez v. United States*, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015) (extension of traffic stop to conduct dog sniff without reasonable suspicion to conduct dog sniff constitutes unreasonable seizure); *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005) (citing *United States v. Jacobsen*, 466 U.S. 109, 124, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984)) ("It is nevertheless clear that a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution.")

In this case, it is clear that the stop was unreasonably prolonged by the officers initial questioning that had no relation whatsoever to the traffic offense for which Mr. Coleman was stopped (using high beam headlights). The persistent questioning concerning gang membership and criminal history immediately upon encountering Mr. Coleman measurably extended the stop's duration and violated Mr. Coleman's constitutional rights. *See Johnson*, 555 U.S. at 333. It was incumbent upon the police to investigate and determine whether to issue a traffic

8

ticket. Instead of investigating the traffic violation and checking Mr. Coleman's identification for active warrants, from the outset the police choose to repeatedly question Mr. Coleman about gang affiliation and criminal history.

In *United States v. Chavez-Valenzuela,* 268 F.3d 719 (9th Cir. 2001), Valenzuela was pulled over for following a vehicle too closely. While a dispatcher checked his license and registration, the officer questioned Valenzuela about where he had been and where he was heading. During the questioning, the officer noted Valenzuela was trembling and would not make eye contact. Upon learning the license and registration was valid, the officer returned the items to Valenzuela. The officer then questioned whether there were any drugs in the car and asked for consent to search the vehicle, to which Valenzuela agreed.

The Ninth Circuit, found sufficient justification for the initial traffic stop, but concluded that the subsequent search exceeded the scope of the initial traffic stop. The Ninth Circuit found the extreme shaking and avoiding of eye contact insufficient to justify extended detention and inquiry into criminal activity. The Ninth Circuit noted that even though Valenzuela's license was returned, a reasonable person would not believe he could disregard the inquiry and questioning. The Court held that the officer lacked the requisite reasonable suspicion when he continued to detain Valenzuela after completing the traffic stop and questioned him about drugs. The Court also found Valenzuela's consent to search was subsequent to an illegal investigation and was therefore tainted by the illegality and inadmissible.

Mr. Coleman is similarly situated to the defendant in *Valenzuela* and can also establish a Fourth Amendment violation. Similar to *Valenzuela*, Mr. Coleman was pulled over for a minor traffic violation, was questioned about things unrelated to the traffic stop without basis – here, criminal history and gang membership, and was asked and provided consent to search the vehicle. In

*Valenzuela*, the Ninth Circuit found extreme shaking and avoidance of eye contact insufficient to justify extended detention and inquiry into criminal activity. Here, Mr. Coleman was nothing but cooperative throughout the entirety of the stop and the police did not note any odd or erratic behavior. Thus, as Mr. Coleman is similarly situated to the defendant in *Valenzuela* he can demonstrate a Fourth Amendment violation which entitles him to suppression.

In *United States v. Garcia-Rivera,* 353 F.3d 788 (9th Cir. 2003), Garcia-Rivera was pulled over for driving a vehicle with a cracked windshield. The officer indicated he observed Garcia-Rivera make a furtive movement as if reaching for something within the vehicle. Garcia-Rivera was unable to provide a drivers license, identification, vehicle registration or proof of insurance. Officers obtained consent from Garcia-Rivera to search the vehicle and located a firearm. The Ninth Circuit found no merit to Garcia-Rivera's argument that the officer impermissibly expanded the scope of the stop given the furtive movements and inability to provide any of the documentation requested.

Not present in the instant case, are the determinative factors discussed in *Garcia-Rivera.* In that case, the Ninth Circuit found the fact that the officer witnessed Garcia-Rivera make furtive movements as if he was quickly hiding something combined with the fact that he could not provide a license, identification, registration or insurance to create additional suspicion. Here, Mr. Coleman made no furtive movements and immediately provided officers with an identification card and car paperwork. Importantly, the officers noted no peculiar behavior from Mr. Coleman and described him as cooperative (Discovery, p. 6).

In *United States v. Digiovanni,* 650 F.3d 498, 500–13, (4th Cir. 2011), the court held that an officer violated the Fourth Amendment's limit on the duration and scope of a traffic stop when the police officer delayed the traffic violation processing to ask questions about drug trafficking and to request consent to

search.

Similarly, a separate court found an officer impermissibly deviated from the purpose of the stop when he asked the driver to stop out of the car and commenced questioning about drugs inside the vehicle based only on knowledge of the driver's identity and criminal history. *See United States v. Jackson*, No. 3:16-cr-00453-AA-1, 2018 U.S. Dist. LEXIS 111902, at *4 (D. Or. July 5, 2018).

As in *Digiovanni* and *Jackson*, Mr. Coleman is entitled to the same suppression because the officer delayed the traffic violation processing to ask questions unrelated to the traffic stop. The officer's questioning impermissibly deviated from the purpose of the stop. Under these cases, Mr. Coleman can establish a violation of his Fourth Amendment rights which entitle him to suppression.

In *United States v. Brigham*, 343 F.3d 490, 497(5th Cir. 2003), the appellant argued the officers seven minutes of questioning before beginning a computer check violated his Fourth Amendment rights because the officers initial questioning had nothing to do with either the original reason for the traffic stop (following too closely) or to any subsequent suspicions the officer may have had regarding whether the rental car was stolen. Under these facts, Brigham argued the detention was unreasonably extended by the questioning and because it was not the least intrusive means of resolving the traffic stop. *Id.*

The Court, in reversing based upon a Fourth Amendment violation, noted the officer took an extended amount of time to ask questions unrelated to the initial traffic stop which made the detention unreasonable. *Id.* at 503–04. The *Brigham* Court explained it is clearly established law that a police officer is prohibited from extending questioning beyond the computer check on matters outside the scope. *Id.* at 503. The Court noted it is also equally clear that the officer is also prohibited from partaking in such questions before he initiates the

check. *Id.* Given that the questions asked by the officer were unrelated to the reason for which the traffic stop was made or to the suspicion later acquired that the car could be stolen, the questioning extended the duration of the stop and was unlawful. *Id. See also United States v. Jones*, 234 F.3d 234, 241 (5th Cir. 2000) (concluding that three minutes of prolonged detention after the computer check came back clean violated the Fourth Amendment).

The facts of the instant case are extremely similar to the facts in *Brigham.* Here, officers questioned Mr. Coleman about gang membership and criminal history before even attempting to investigate the traffic violation. In fact, all of the questioning that occurred about gangs and criminal history occurred before the officer returned to his vehicle to conduct a records check on Mr. Coleman and the vehicle. Just as in *Brigham,* the traffic stop was unreasonably extended by the questioning and it was not the least intrusive means of resolving the traffic stop. Mr. Coleman's cooperative behavior and presenting of an identification card was not a basis to berate Mr. Coleman with questioning about gangs. This unconstitutionally prolonged the purpose of the traffic stop and resulted in an illegal detention. Based upon the rationale of *Brigham*, Mr. Coleman can establish a Fourth Amendment violation.

If an officer, after the stop, develops reasonable suspicion to believe that criminal activity is afoot, as long as the officer diligently pursues the investigation, the questioning and time of detention can extend beyond matters related to the initial traffic stop. *United States v. Bloomfield,* 40 F.3d 910 (8th Cir. 1994).

In this case, the officer had no basis to develop any reasonable suspicion to believe that criminal activity was afoot during the course of the traffic stop. In fact, this is proven by the fact that the officer began questioning Mr. Coleman about gang membership and criminal history immediately upon coming into contact with him. Additionally, the officer's reports do not mention any action on

behalf of Mr. Coleman that gave rise to the suspicion necessary for further questioning.

As is demonstrated by the case law above, the officer clearly violated Mr. Coleman's Fourth Amendment rights by prolonging his detention to ask questions completely unrelated to the reason for the traffic stop. Curiously, the police claimed to have asked Mr. Coleman the gang related questions only after he had been placed in handcuffs after viewing a gang related tattoo. Given the body camera footage, Mr. Coleman can demonstrate this is false. Either the officer is seriously mistaken or the officer is aware that court's have repeatedly condemned this type of questioning as unconstitutional.

The officer's continued questioning of Mr. Coleman about gang membership and criminal history after he allegedly committed the most minor of traffic laws violated his constitutional rights. As such, Mr. Coleman can clearly establish a violation of his Fourth Amendment rights under the United States Constitution and he is entitled to suppression.

    **B.**    **THE CONSENT TO SEARCH WAS INVALID BECAUSE IT WAS NOT VOLUNTARY THERE WAS NO ATTENUATION SUFFICIENT TO DISSIPATE THE TAINT FROM THE FOURTH AMENDMENT VIOLATION.**

As Mr. Coleman can demonstrate his Fourth Amendment rights were violated by the prolonged and illegal detention, this Court must determine whether the consent to search obtained after the fact was voluntary and a product of free will. The Court must also determine whether the temporal proximity between the constitutional violation and the subsequent consent purged the taint of the violation. Mr. Coleman can establish the consent obtained after the violation of his constitutional rights was neither voluntary nor the product of free will. Mr. Coleman can also establish the consent occurred immediately after the constitutional violation, rendering it invalid and requiring suppression.

13

After the Court in *Brigham* found a Fourth Amendment violation, the Court then considered whether the driver's subsequent consent to search was valid. 343 F.3d at 505. The *Brigham* court noted that consent to search may, but does not necessarily, dissipate the taint of a Fourth Amendment violation. *Id. Citing Chavez-Villarreal*, 3 F.3d 124, 127 (5th Cir. 1993). Because the time between the illegal detention and the later consent was approximately ten minutes, Brigham was outside of this car when he provided the consent, and the circumstances did not indicate a basis for believing he was free to leave, the court found the consent was not a product of free will and was therefore invalid. 343 F.3d at 505–06.

In this case, the time elapsed between the prolonged, and thus illegal detention and the subsequent consent was immediate. Additionally, similarly to *Brigham*, Mr. Coleman was ordered from the car, searched, and told to place his hands on the front of the police car. At the time Mr. Coleman was ordered from the car, the police still had his identification in their possession. These circumstances do not indicate a basis for Mr. Coleman believing he was free to terminate the encounter and leave. As such, the consent obtained after the illegal detention was not a product of free will and invalid, requiring suppression.

The Ninth Circuit in *United States v. Washington*, 490 F.3d 765 (9th Cir. 2007), considered a similar issue. After finding the officer's actions violated the Fourth Amendment, the Ninth Circuit had to determine whether Washington's subsequent consent to the search of his car was voluntary. *Id.* at 774–75. Under the fruit of the poisonous tree doctrine, evidence obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is inadmissible, despite a person's voluntary consent, unless the evidence obtained was "purged of the primary taint." *See generally Wong Sun v. United States*, 371 US 471, 83 S Ct 407, 9 L. Ed. 441 (1963). *See also Florida v. Royer,* 460 U.S. 491, 501, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983); *United states v. Patzer,* 277 F.3d 1080, 1084 (9th Cir. 2002). "Testimony as to matters observed during an unlawful invasion has

been excluded in order to enforce the basic constitutional policies...deterring lawless conduct by federal officers...and closing the doors of the federal courts to any use of evidence unconstitutionally obtained." *Wong Sun*, 371 U.S. at 485–86.

The test for admissibility of the evidence under such circumstances is two-fold in that the consent must be voluntary, but must also be "sufficiently an act of free will to purge the primary taint." *Washington*, 490 F.3d at 775. *See also Anderson v. Calderon*, 232 F.3d 1053, 1072, 1076 (9th Cir. 2000), *abrogated on other grounds by Osband v. Woodford,* 290 F.3d 1036, 1043 (9th Cir. 2002).

There are five factors, none of which are individually dispositive, to determine if consent is voluntary: "1) whether defendant was in custody 2) whether the arresting officers had their guns drawn; 3) whether Miranda warnings were given; 4) whether the defendant was notified that [he] had a right not to consent; and 5) whether the defendant had been told a search warrant could be obtained." *Washington,* 490 F.3d at 775. *Citing United States v. Soriano,* 361 F.3d 494, 502 (9thCir. 2004)(internal quotation marks omitted). In finding that Washington's consent to search was not voluntary, the Ninth Circuit noted the encounter occurred at night, the defendant as outnumbered two-to-one, the defendant was searched by the police, the defendant was directed to put his hands on the hood of the police car, and a reasonable person would not feel free to terminate the encounter and leave. *Id.*

In this case a review of the factors demonstrates that the consent obtained by Mr. Coleman was not voluntary. At the time Mr. Coleman gave consent, he was pulled from his car, outnumbered by officers, searched, and ordered to place his hands on the hood of the police car. These facts are nearly identical to the facts identified as the basis in *Washington* for determining that an individual would not feel free to leave. Additionally, in this case, the police retained Mr. Coleman's identification card. Based on the totality of the circumstances, it is clear that a

reasonable person would not feel free to leave. Thus, the consent obtained should be deemed involuntary.

Moreover, in *United States v. Valdez*, 931 F.2d 1448, 1452 (9th Cir. 1991), the Ninth Circuit considered an additional factor – that consent obtained was tainted by the illegal stop and detention that preceded his consent to the search of his car, and that factor weighed in favor of concluding that consent to search was not voluntary. In this case, the consent was also tainted by the illegal detention that proceeded the consent to search, furthering a finding that consent was not voluntary.

Lastly, the *Washington* court also considered temporal proximity and found the consent to search was invalid because the consent to search occurred immediately after the illegal seizure occurred so there was no lapse in time sufficient to purge the taint. 490 F.3d at 776–77.

Here, there was no sufficient passage of time between the invalid prolonged detention and the subsequent consent. The consent occurred seconds after the prolonged questioning concluded. Immediately after Mr. Coleman was ordered from the car and told to place his hands on the hood of the vehicle, the police requested and obtained consent. Thus, it is clear there was no lapse in time sufficient to purge the taint from the constitutional violation.

As such, this Court should find that the consent obtained subsequent to the constitutional violation was not a product of free will, was not voluntary, and was not accompanied by passage of time sufficient to overcome the taint of the violation.

///

///

///

16

# **CONCLUSION**

Given the prolonged and unconstitutional questioning of Mr. Coleman resulting in a violation of his Fourth Amendment rights, Mr. Coleman would respectfully requests that this Court suppress all evidence seized from the vehicle and any fruits of the poisonous tree attached to those items. *See Wong Sun v. United States*, 371 U.S. 471 (1963).

DATED this 11th day of October, 2018.

/s/ Christopher R. Oram, Esq.
CHRISTOPHER R. ORAM, ESQ.
Nevada Bar #004349
520 S. Fourth Street, 2nd Floor
Las Vegas, Nevada 89101
(702) 384-5563

## CERTIFICATE OF SERVICE

I hereby certify that I am an employee of CHRISTOPHER R. ORAM, ESQ., and that on the 11th day of October, I served a copy of the foregoing Motion to Suppress by U.S. District Court CM/ECF Electronic Filing, to:

BRIAN WHANG, ESQ.
Assistant United States Attorney
501 Las Vegas Blvd. South
Suite 100
Las Vegas, Nevada 89101

/s/ Nancy Medina
An Employee of Christopher R. Oram, Esq.