# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

\* \* \*

| UNITED STATES OF AMERICA, | Case No. 2:18-cr-00219-RFB-VCF |
|---|---|
| Plaintiff, | **ORDER** |
| v. | |
| DEAN COLEMAN, | |
| Defendant. | |

## I. INTRODUCTION

Before the Court is Mr. Coleman's Motion to Suppress [ECF No. 26]. The Court held an evidentiary hearing over several days on this Motion. For the reasons stated below, the Court GRANTS the Motion to Suppress [ECF No. 26].

## II. FACTUAL FINDINGS

The Court makes the following factual findings. On January 18, 2018 at around 11:00 p.m., Las Vegas Metropolitan Police Officer Juan Ostorga conducted a vehicle stop of the vehicle being driven by Defendant Dean Coleman. At the time of the stop Ostorga was a member of a "violent crime unit" or a "vc unit." The mandate for this unit was to patrol with an emphasis on 'proactively' investigating crimes related to gangs, drugs and guns. This vc unit uses vehicle stops as a means of proactively and pretextually investigating crimes related to gangs, drugs and guns.

Ostorga pulled Coleman over because Coleman was driving with high beam lights on in traffic in violation of Nevada law. N.R.S. § 484D.215 Ostorga was driving in a marked patrol vehicle with a partner, patrol officer Sergio Felix. Both vehicles pulled over into a parking lot near a fast food restaurant. The patrol car came to a stop behind Coleman's vehicle—not completely

blocking it in but making it difficult for Coleman to turn around if the patrol car did not move. Ostorga exited his vehicle and approached Coleman's vehicle on the driver's side. From behind Coleman's car, Ostorga ordered Coleman in a loud voice to roll down all of the windows in the car. Coleman complied and then put his hands in the air. As Ostorga walked up to the vehicle, he had flashlight out and on. Felix also had his flashlight out and was looking into the car. Both could see into the entire interior area of the car. Coleman's driver-side window was completely down when Ostorga arrived at the driver's door. The officers did not see any illegal contraband or weapons in plain view in the interior of the vehicle.

Ostorga then told Coleman that he was pulling him over because he was driving with high beams on his car. Coleman admitted that he was driving with high beams on. He stated that he was driving this way, because one of the normal headlights was out. He had a replacement bulb in the trunk of the car but he had not yet replaced the light. Ostorga asked Coleman for his license and registration. Coleman told Ostorga that the vehicle belonged to his girlfriend and that he did not have a driver's license. Coleman said he did have a Nevada identification card. Ostorga ordered Coleman to provide the ID card and Coleman complied.

Ostorga then asked Coleman if he had ever been arrested previously. Coleman admitted that he had previously been convicted of robbery and that he had recently been released from prison. Ostorga then asked Coleman "who do you roll with?" He also asked Coleman where Coleman was from. Coleman said he was from California. Ostorga then repeated his question "who do you roll with?" Ostorga said if he were to call "California gangs" what would they say about Coleman. Coleman then admitted that he had been a "Blood" gang member but that he was no longer involved with gangs. Ostorga said that Coleman should have told him that Coleman was a Blood earlier. Ostorga said "I am just going to keep asking you until you tell me." Ostorga then asked Coleman which Blood gang had Coleman belonged to and Coleman said had been a "Piru Blood." This last exchange took less than a minute. Ostraga then walked backed to his patrol car with Coleman's Nevada ID card.

Coleman than asked his partner, Felix, to conduct a check of Coleman's ID card and to look for warrants. Felix, who was seated in the car, told Ostorga that Coleman had a previous

conviction for robbery, battery and weapons possession. The officers did not discover any outstanding state warrants for Coleman's arrest. Felix and Ostorga also discovered that Coleman was currently on federal probation or supervised release. The officers did not have much experience with federal probation or supervised release. They did not know that Coleman's traffic violations could serve as basis for supervised release violations which could lead to his arrest <u>or</u> a summons.

Importantly, after finding that Coleman had no warrants, the officers decided to conduct an additional check/request for information regarding his federal probation officer. The officers had decided not to arrest him for any traffic violations or other violations, including violations of his federal supervised release. Ostorga , however, did tell Felix to try to contact Coleman's probation officer for the purpose of getting permission to search the vehicle. Ostorga decided to further investigate Coleman for guns or drugs or other gang-related criminal activity/evidence. Ostorga then told Felix that he was going to take Coleman out of the car to search him. He did this to further investigate Coleman and search the vehicle.

Ostorga then walked back to the Coleman's car. He ordered Coleman to step out of the vehicle. The Court finds that Ostorga did this to further investigate Coleman not because he had a subjective safety concern. Indeed, he told Coleman he was not worried about safety even after hearing about Coleman's record and he told Coleman he could put his hands down while seated in the car. Coleman complied with the order to get out of the vehicle. Ostorga then ordered Coleman to place his hands behind his back. Coleman complied. Ostorga then searched Coleman's body and clothing. He did not find any weapons or contraband. Ostorga then ordered Coleman to stand in front of Ostorga 's patrol car. Coleman complied. Coleman placed his hands on the front of the patrol car. After Coleman complied with Ostorga 's order to stand in front of the patrol car, Ostorga then conducted another search of the visible interior of the vehicle with his flashlight. He did not find any illegal contraband or weapons. Ostorga then asked Coleman "Nothing in the car that I should be aware of?" And Coleman responded "no." Ostorga then asked, "Be cool if I search it?" Coleman did not respond to this question. Ostorga then asked "What's up? You okay if I search
///

it?" Coleman, who was then standing in front of the patrol car with his hands on the hood replied "yes."

Ostorga then began a thorough search of the vehicle. Upon removing a panel of a compartment near the leg area of the driver's side of the vehicle, Ostorga observed a weapon—a handgun. He then walked back to his patrol car and placed handcuffs on Coleman. Ostorga told Coleman he was being handcuffed and placed into custody for having the weapon.

### III. LEGAL STANDARD

#### A. Permissible Duration of Vehicle Stop

"A seizure for a traffic violation justifies a police investigation of that violation." Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015). A "routine traffic stop" is more analogous to a "Terry stop" than a formal arrest. Id. (internal citations omitted). "Like a Terry stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop" and address "related safety concerns." Id. (internal citations omitted). "Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose." Id. (internal citations omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Id. (internal citations omitted).

"Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop. Typically, such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id. at 1615 (internal citations omitted)

The Fourth Amendment does tolerate certain unrelated investigations during a traffic stop so long as they do "not lengthen the roadside detention." Arizona v. Johnson, 555 U.S. 323, 327-28 (2009). The seizure remains lawful "so long as [unrelated] inquiries do not measurably extend the duration of the stop." Id. at 333. However, a traffic stop "can become unlawful if its prolonged

///

beyond the time reasonably required to complete the mission" of the traffic stop. Illinois v. Caballes, 543 U.S. 405, 407 (2005).

In determining the reasonable duration of a stop, it is "appropriate to examine whether the police diligently pursued [the] investigation." United States v. Sharpe, 470 U.S. 675, 686 (1985).

### B. Voluntariness of Consent

The Ninth Circuit has "identified five factors, none of which is individually dispositive, to determine if a consent to search was voluntarily given: (1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was notified that [he] had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained." United States v. Washington, 490 F.3d 765, 776 (9th Cir. 2007).

A person is seized or in custody if "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." Florida v. Bostick, 501 U.S. 429, 437 (1991) (internal citations omitted).

The Government has the burden of proving that consent to a warrantless search was voluntary. United States v. Kaplan, 895 F.2d 618, 622 (9th Cir.1990);

### IV. DISCUSSION

#### A. Stop Was Improperly Extended

The Court finds that the stop was improperly extended from the moment that Ostorga ordered Coleman to step out of the car. There are several reasons for this findings. First, at the time that Ostorga ordered Coleman out of the car, the officers already had all of the information they required to complete citations for the traffic violations. They had decided not to arrest Coleman for these violations or any other crimes. He did not have any warrants for his arrest. They had also decided not to tow his vehicle. They had completed their "mission" in relation to the traffic stop violations. Rodriguez, 135 S. Ct. at 1615.

/ / /

Second, the Court finds that Ostorga made the decision to order Coleman out of the vehicle without any reasonable suspicion or probable cause that there would be evidence of a crime in the car. He ordered Coleman out of the car for the purpose of searching Coleman and the vehicle. He did not do so to further investigate details of the traffic violations or for any other articulable reason suggesting criminal activity was afoot. See United States v. Evans, 786 F.3d 779, 788 (9th Cir. 2015) (explaining that "an officer may [only] prolong a traffic stop if the prolongation itself is supported by independent reasonable suspicion"). He did so because it was the practice of his "vc unit" to use such traffic stops to conduct searches of suspected gang members for guns or drugs. This further investigation unlawfully extended the stop. Id.

Third, the Court further finds the officers had completed their "ordinary inquiries" which they are permitted to do under Rodriguez with regard to the stop by the time Coleman was ordered out of the vehicle. Id. at 1615. At the time Ostorga walked back to the vehicle to order Coleman out of the vehicle, the officers had completed their check of Coleman's identification. They had found no warrants. They had not further information they needed to obtain in regard their 'ordinary inquiries.'

The Court rejects the government's argument that Ostorga could further extend the stop in order to investigate Coleman's alleged violation of supervised release. The officers had no idea the traffic violations could be violations of Coleman's supervised release. They certainly did not prolong the stop to investigate this. They prolonged the stop to search for gang-related evidence. They were attempting to call Coleman's probation officer to get permission to search his vehicle and not to investigate a violation of his federal supervised release. Additionally, they did not need to prolong the stop even if they were investigating an alleged violation of supervised release because they already had sufficient evidence of Coleman's traffic violations which could have served as a violation of supervised release. Moreover, supervised release violations do not require arrest and the officers did not decide to order Coleman out of the vehicle to arrest him for such a violation. See 18 U.S.C. § 3583.

Fourth, the Court finds that the officers were not diligently investigating Coleman's traffic violations. Sharpe, 470 U.S. at 686. After Ostorga talked with Coleman, and Coleman admitted

to the traffic violations, the officers did not further investigate these traffic violations. Rather, they conducted a check of Coleman's identification. After learning of his criminal history and considering his alleged past gang affiliation, Ostorga decided to search Coleman and the vehicle. The officers did nothing else to investigate the traffic violations in this case. They did not write citations for Coleman for the violations.

**B. The Consent Was Not Voluntary**

Applying the relevant factors under <u>Washington</u> and considering the totality of the circumstances, the Court finds that Coleman's consent to search the vehicle was not voluntary.

First, at the time of Coleman's consent to search he was in custody. Specifically, the Court finds that immediately prior to his consent, Coleman had been questioned in his car. He had been ordered to provide his Nevada ID card. He had then been ordered out of his car. He had been searched. After being searched and the officers finding nothing, Coleman had still been ordered to stand in front of the patrol car. Ostorga then searched the visible area of Coleman's car with a flashlight and found nothing. And still, he had not been told he was free to leave. He had not been given his identification card back by the police. He had not been permitted to return to his car or told that he could return to his car. He had not been told why he was being detained or how long he would be detained further or when he might be released. He had answered all of the Ostorga's questions and complied with all of the officers' orders yet had not been released. At the time of the consent he had both hands on the front of the patrol car with its lights flashing and two armed uniformed police officers in the car. He had not been told he could remove his hands from the patrol car. Indeed, in response to the authority demonstrated by the officers Coleman had essentially kept his hands in the air, or behind his back or on the patrol car for most of his entire interaction with Ostorga . A reasonable person in such circumstances would not believe he was free to leave, and Coleman certainly did not feel that he was free to leave. In fact, Coleman could not have left as the police still possessed his identification card. Finally, the Court finds that Ostorga and Felix would not have let Coleman simply turn around and leave at that time. This factor weighs heavily toward involuntariness.

///

Additionally, the Court finds that Ostorga did not have a subjective or objective safety concern when he ordered Coleman to go and stand in front of the patrol car. By this time, Ostorga had searched both Coleman and the visible area of the interior of the vehicle. He had found nothing and seen nothing. His motivation for directing Coleman to the front of the police car was to facilitate his intended search of the car and not to facilitate anything having to do with completing the traffic stop.

The second factor weighs toward the consent being voluntary. The officers did not have their guns draw when Coleman was questioned or when he was asked for consent. The officers did not draw their weapons during the entire encounter.

The third factor weighs heavily toward involuntariness. Coleman was not Mirandized. He was never told that he did not have to answer any questions or that he could remain silent. This failure is significant because the Court finds factually that the consent was obtained after Coleman deliberately remained silent after being initially asked for consent to search the car and after the stop was illegally extended. It was only after he was subsequently prodded out of his silence by Ostorga in a louder and more forceful request that he acquiesced to the search and said "yes sir" in response to a second request to search the car. The Court also finds that at the time consent was requested he would not have been free to leave, that he would not have been permitted to return to his car and that he would not have been permitted to even walk away from the front of the patrol car.

The fourth factor also weighs heavily toward involuntariness. Coleman was never told that he could not consent. The Court finds this failure compelling for two reasons. First, the Court finds in this case based upon the video evidence and the hearing testimony that Ostorga explicitly and knowingly did not inform Coleman of his right not to consent to a search since Ostorga 's "vc unit" used such traffic stops as a means for proactively searching for guns, drugs and other gang-related contraband. Second, the failure to inform Coleman of his right to consent takes on particular significance since he remained deliberately silent when he was first asked for consent to search by Ostorga . The Court finds it highly likely that he would not have consented to a search had he been told of his right not to consent or had he been Mirandized.

The fifth factor also weighs heavily toward involuntariness. While the officers never explicitly said to Coleman that they were obtaining or could obtain a warrant, the Court finds that Ostorga made it quite clear to Coleman that he would not be permitted to leave until Ostorga searched the car—with or without Coleman's consent. First, the Court finds based upon the video and testimony that Ostorga always intended to search the vehicle. This was consistent with the practice of his "vc unit" which he admitted included using traffic stops to "proactively" search individuals and cars for guns, drugs or other gang-related contraband. Second, in his questioning of Coleman, he had made it explicitly clear the he would keep asking Coleman questions, even if it meant repeating the question, until he received an answer that he found acceptable. So, in his questioning of Coleman about Coleman's potential gang affiliation earlier in the stop, Ostorga repeatedly asked Coleman "who do you roll with?" When Coleman did not provide an answer he found satisfactory, he either chastised Coleman for a nonresponsive answer, repeated the question, or threatened to call other law enforcement officers to see if Coleman was lying to him. And when Coleman finally provided Ostorga with a gang name (whether the affiliation is true or not is unknown), Ostorga reproached Coleman quite forcefully telling Coleman that he should not "dilly dally" because "I am just going to keep asking until you answer." This exchange was both telling and instructive for Coleman who learned that Ostorga would continue to detain Coleman until Coleman gave an answer that Ostorga thought appropriate. So when Ostorga later asked Coleman for consent to search and Coleman deliberately stayed silent, Ostorga asked Coleman again more forcefully just as he had in the questions regarding gang affiliation. And Coleman knew and the Court finds that Ostorga would have continued to ask him, detain him and retain his ID card until he consented to the search.

Finally, the Court finds that without the consent to search, the officers did not have probable cause to search the vehicle. Both Ostorga and Felix had used their flashlights to inspect the entire visible area of the interior of the car. Ostorga had done this twice before asking for consent. They had not observed any contraband or found any evidence of past or future crime.

/ / /

/ / /

## V. CONCLUSION

For the reasons stated,

**IT IS ORDERED** that the Motion to Suppress [ECF No. 26] is GRANTED.

**DATED:** September 8, 2019.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**